Thank you, Your Honors. Counsel, may it please the court. My name is Aaron Heisel. I represent the City of Grants Pass in this matter. And depending on the court's inquiries, my intent right now is to reserve about seven or eight minutes. I'll do my best to respect the court's time this afternoon. Thank you. This is a step in the next direction after Martin v. Boise was decided in 2018. The city's post-Martin amendments to its ordinances and to its enforcement practices being challenged in this case were specifically designed to, and do in fact, provide grace to those without shelter to sleep without risk of enforcement, but still prescribes the conduct of occupation of any one piece of government property indefinitely as a place to live. Ensured those who did not have shelter were not having this enforced for the by removing sleeping from the prohibited conduct of the ordinances as to all of them related to camping and leaving prohibited sleeping in only the one that prohibited on pedestrian or vehicle rights of ways, streets, alleys,  the record is uncontroverted that those policies have been in place, that these have been very sparingly issued at all post-Martin and only after often multiple warnings. This approach is not only lawful under the eighth amendment, even after Martin, I would argue that it is acutely necessary because of Martin that these types of common sense approaches exist in the law to allow people the grace to sleep without dictating to them where they sleep or how they sleep or when they sleep and yet still maintaining a safe place for everybody, but not allowing an encampment to be created. Here, the district court at every stage of the litigation ignored the by the legal issues present in this case. At the class certification stage, the court rejected any need for individual scrutiny and on that basis, although they were very different, granted class status on the backs of the three very differently situated plaintiffs in this case, on the basis that they represented quote unquote, just different forms of modern day homelessness. Unsurprisingly with that standard in place, we move forward in the litigation and once that class is certified, which includes every single person that meets HUD's definition of homeless, not only in the city, but in the surrounding area around the city, even though by those very same definitions, you can be HUD homeless and that by definition, what was what was granted here. And then we move forward and now it's the class becomes this sort of amorphous super plaintiff that represents every possible form of quote unquote, modern day homelessness. We don't have any concrete facts we're even dealing with. And now the analysis, as we get to these cross motions for summary judgment, are on the one side, the district court applies the standard to this class plaintiff as if any member of the class could hypothetically be impacted, well then the whole class, everyone that meets HUD's definition of homeless in or around the city, they're all entitled to relief. And on the other hand, if any shelter or other local options are not ideally suited for the entire class, then they count it as nothing. But it's not all hypothetical because we do have some, you know, specific facts. I mean, even if the, I'm assuming just for the moment arguendo that the class would be certified, why wouldn't Miss Blake have a claim under Martin? Even in, even if Miss Blake had a claim under Martin, we would still need the individual scrutiny on a concrete date in question. The evidence here is that yes, Miss Blake is the one of the, she's now passed away, but she was the only plaintiff in this case that actually did sleep in the city's parks, not in a vehicle, the other two have access to a vehicle and have only been homeless with access to a vehicle. But as to Miss Blake, it is true that she was the one that actually did sleep in the parks, but even through the course of discovery in this case, she was intermittently homeless. She wasn't homeless or unsheltered every night. But there is a specific, I mean, that says on the district court's ruling that on September 11th, 2019, she was cited for illegal camping and then she was convicted and fined $590. So we would at least have that. You haven't raised because, I guess, because this is civil, you've not raised any kind of a heck based objection like we addressed in Martin. And so that would be a specific eighth amendment claim under Martin, at least with respect to Miss Blake. Am I, am I wrong? I think that she would have standing. I don't think that she would have a successful argument under Blake, but I think that she would have standing, correct. And I appreciate you raising that issue and what the district court found on that, because it is, and you've identified it, the one time, the one place where both sides presented evidence on a concrete enforcement action. The rest of this entire case, because of the differences in the way that Mr. Johnson and I view the law really, and our, our respective colleagues view the law on these issues. The, the, even though we were on cross motions for summary judgment, this one instance with Miss Blake is literally the one place where the evidence even crosses paths because they believed and interpreted their interpretation of Martin allowed them to just prosecute it at a 30,000 foot view. And we were the ones saying, no, there's individual scrutiny demanded here. And the dish there on that one, there was competing evidence. The police officer that issued that citation says that he was there the previous day, saw her camping in the park, just spoke with her, warned her that he was coming back the next day. And if she was still camping there, he would cite her and then came back the next day and cite her. In fact, that piece of it, that critical piece of it, that temporal 24 hour warning from the day prior is not in dispute. Miss Blake omits that from her testimony and her declaration. And here we don't have a retrospective claim for damages by Miss Blake for that instance. So a single instance is insufficient for the plaintiffs to have carried their burden. They had to have shown a persistent pattern of unconstitutional enforcement of these policies and these ordinances in order to carry their burden and be entitled to injunctive relief. So even if their version were true and undisputed, it would still be insufficient to have carried their burden at summary judgment. Um, those types of individual scrutiny issues permeate the rest of a lot of these other legal issues that we have in front of us, and I think one way to posit both the conduct and status issue and the facial versus as applied issue is to look at Robinson and Powell, the two Supreme Court cases where the court has wrestled with these, um, unavoidable status type issues. In Powell, that was, uh, let's start with Robinson. Robinson is the one where California makes it illegal to be a drug addict. It is a purely facial challenge. It is, it is being challenged and is unlawful as to everyone. In that instance, and only that instance has the Supreme Court ever placed the eighth amendment inquiry at the front of process. We are going to strike down the entire law under the eighth amendment because it is, uh, you can't do this as anybody. You're making it unlawful to be status. The equivalent here would be if the city had made it unlawful to be homeless. In that instance, we can put the eighth amendment inquiry at the front and say, no, you cannot make that status illegal, foul, but Powell is the as applied version and it's a plurality opinion. It is the dissent plus Justice White's concurrence in that case that creates the logic from Jones VLA, which is then adopted by the Martin panel. That's how we get here. And even in that case, Mr. Powell was the one who was convicted of public intoxication by the state of Texas. He says, I should have been convicted because I'm an alcoholic and I'm homeless. So I'm, I'm habitually drunk and I have to do those things in public. And that divided court, some justices say, no, this is purely conduct. No, no issue with the eighth amendment. Others say it is because it's unavoidable. And then there was Justice White. And Justice White, even Justice White, who says for some of these alcoholics, I would think a showing could be made that resisting drunkenness is impossible. And then avoiding public places when intoxicated is also impossible. But on the record before him, the individual scrutiny necessary, the record on that precise night, what were his other options? What else could he have done on that night? Even Justice White would not go there. So that's why he joins the others saying this is conduct. Then we, all of those things end up with Martin. And in Martin, they had a laws in place that expressly barred you from sleeping anywhere in the city at any time. And we're actually enforcing the sleeping aspect of that, those ordinances with arrests, and the record in that case established both of those truths, the record in this case is absent on both of those truths. After Martin, as I noted earlier, they removed sleeping from both of their camping ordinance so that it was no longer even a prescribed piece of the conduct and began not issuing them unless and until warnings and information had been provided prior. No one in Grant's past, post Martin, has ever been cited for the simple act of sleeping in public or resting in public. They have taken this very common sense temporal approach that avoids a lot of these state created danger traps that seem to be trying to be set by the other side where they say, well, all you should have done is change the ordinance to give us a non-enforcement zone or a non-enforcement hours or those types of things, you don't have a house, but I'm going to designate this park. This is the only park that you can lawfully sleep in. I'm telling you, you can only sleep there at night and you have to all go there. As soon as somebody is harmed or raped, or there's an overdose or any of those things in that designated area, it's the government's fault for that too, because we've told you that's the only place that you can be. So this very reasonable, very pragmatic approach is not only lawful under Martin, it is necessary because of Martin. And I'd like to reserve some time for rebuttal. That's fine. So if you want to conclude now, you've got six, more than six minutes on you.  We'll hold that for rebuttal and we'll hear from Mr. Johnson. Thank you. May it please the court. My name's Ed Johnson, along with Walter Fonseca, my co-counsel. We represent the plaintiff class in this matter. Hundreds of people who are experiencing homelessness in Grants Pass, Oregon. I want to start at the end of this case with the final injunction. You can see it at excerpt of record, pages five and six. What the district court ultimately ordered here is very limited and narrowly tailored. It doesn't require the city of Grants Pass to take any affirmative steps of any kind. It certainly allows the city to prohibit anything that It allows the city to enforce its anti-sleeping ordinance at any time. And it allows the city to enforce its two very sweeping anti-camping ordinances, which are really at the heart of this lawsuit at all times and all places, except for some nighttime hours in most parks. One park was excluded from the injunction by agreement of the parties. And that's it. In terms of these eighth amendment claims, the only thing this injunction does is press pause on this enforcement scheme for a few hours at night in a few non-residential locations so that class members can engage in a wide range of necessary life sustaining activities, including sleeping without violating the law. So to be clear, as narrow as this injunction is, it's very important to the plaintiff class because without it, as we sit here today, it is illegal in Grants Pass to engage in a wide range of unavoidable, universal life sustaining activities in every inch of public land at all times of the day or night. What exactly is the rule that Martin establishes? Well, I like it when courts start their holding with we hold, because it directs us to what the holding is. And I think that that holding can be found at page 617. What this court said is that where a city has more homeless individuals than shelter beds, they can't punish people for engaging in acts and conditions that are unavoidable. Does that bind us to only looking within the jurisdiction of Grants Pass? I mean, suppose right on the city limit, but just over the city limit, it was a 10,000 bed shelter. Does Martin compel us to ignore that shelter? So I'm not sure that Martin addresses that exact situation. The city of Grants Pass has all sorts of options that they present, including sleeping outside, somewhere outside of the city. What Martin says at page 617 is that the analysis takes place within a jurisdiction and that the available alternatives have to be indoors. So my understanding... So the answer to that, my question is no, that your position is that Martin says that I can only compare number of people and number of shelter beds in the jurisdiction, and so even though there's a 10,000 person shelter across the road, but over the city line, that's irrelevant for Eighth Amendment purposes. Well, I think that that is not the situation that we have in front of us. I know it's not the situation. But I want to know what rule I'm being asked to apply from Martin. And if it's jurisdiction specific, that means something very different. So I think that the test is laid out in footnote eight, which our position is the city misreads that footnote throughout their briefing. But if you look at footnote eight, the last sentence there says that whether an ordinance is consistent with the Eighth Amendment, some other ordinance, this is dealing with hypotheticals, it will depend on as here, whether it punishes a person for lacking the means to live out the universal and unavoidable consequences of being human. And so if I were representing the city in the hypothetical that you just presented, I would say that without, you know, making someone leave town, they can go across the street. And if there are available beds, then you're not really punishing them. But that is not the situation in Grants Pass. But looking at that sentence that's in the footnote, the first sentence that's in the footnote about our holding does not cover individuals who do have access to adequate temporary shelter doesn't say anything about in or outside the jurisdiction. I mean, that sounds like I need to examine the circumstances of the individual person to know whether under Martin, there's an Eighth Amendment violation and applying the prohibition to them. Well, that's certainly the city's position, but I think what Martin says really is the opposite of that. And I would point the court to not the footnote, but the main text at page 617, where the court says that where this ratio of homeless people is greater than practically available shelter beds, you can't punish a person based on the false premise that they have a choice about sleeping outside. And so to me, not only is that not an individual inquiry, it's easier and vastly superior for class treatment because the court is essentially saying you have to look at the totality of the circumstances in a particular municipality. How many homeless people are there and how many shelter? We can't just take that one sentence in isolation. It's attached to the footnote that has two individual specific comments. It then has a further sentence that begins with that is, which is an introduction of a sentence that rephrases what we've said in different terms. And that sentence says so long as there's no option of sleeping indoors, which again sounds individualized. I don't see how Martin establishes anything other than an individual defense. And I have a hard time seeing how it could possibly be certified. Well, there's two questions there. First is whether you have to wait until you are prosecuted and facing conviction to raise it as a defense. And I think that Martin answers that question because two of those plaintiffs were prospective relief. And I think that Martin was not a class action. These people made very individualized showings as to their circumstances. But you're trying to say that Martin establishes some bright line rule that ignores everyone's circumstances, which is not what happened in Martin. And then all of a sudden we just regulate this on a citywide basis. So it's our position that class treatment is fully appropriate and vastly superior. And I agree Martin was six six plaintiffs, not a class, but it's hard to see how a court could analyze this question of how many homeless people there are versus how many available shelter beds in an individual situation. Because the reality is, take an example that I think is in the Fees and Fines Justice Center amicus brief, which is a docket 27-2, that's actually a more favorable situation than what's in Grants Pass. And you can look at pages 18 to 20. The hypothetical there is imagine a city where there are 1000 homeless people and 100 emergency shelter beds. It's true that on any given night, if you were to go around today and see people sleeping, living outside, some of those people are going to get shelter. 100 out of the 1000 are going to get shelter. But the vast majority of people, 90 percent of them, are not going to get shelter. And furthermore, even the 100 who do get shelter are going to be back in that high 10 percent chance of getting shelter. So the fact that someone may get shelter on a particular night is not relevant to what happens out there on the street. It's the people who are living outside and sleeping outside who are making this claim. Right. It's not the folks that found shelter. It's the folks that didn't find shelter. And the question is, can a city punish everyone by ticketing them, citing them, summonsing them to court, trespassing them from an area under threat of arrest for criminal trespass too, before that individual is able to raise their Eighth Amendment claims? And I think the answer in Martin is no. People can do it prospectively. And I believe that under FRCP 23 B-2, a class of people can raise this argument prospectively as well. So I will just turn briefly to this argument that the city makes that they really aren't punishing folks. I will say that this argument wasn't preserved below, but I think it's relevant to the questions you were just asking, Judge Collins. And that is whether the city is just starting the journey through due process by issuing these tickets. And I think that the answer to that is twofold. One, this really is punishment on the front end. I mean, the fact that you are excluded from either all the parks or if you're not in a park, you're excluded from some undefined area. It could be private property. If they have one of those trespass agreements, it could be some other piece of public property. But if you go back in at any time during that exclusion, you will be arrested and handcuffed, taken to jail and charged with criminal trespass, too. So it's that front end punishment that plaintiffs have a right to challenge before they are punished with it. I mean, this plaintiff class has a right to seek prospective, injunctive and declaratory relief about whether this punishment scheme is constitutional before they are drug into court individually. And they won't get a lawyer because these are prosecuted as violations and not misdemeanors. They don't have a right to a jury. You know, the idea that they're going to be able to raise these complicated legal arguments on their own is purely a fiction. And I think it's the public justice brief, which is a docket number 28-2, that also points out that in grants passed, judges have limited discretion to lower these fines. It's not as though a judge can just get rid of this fine at any time. It is only in the case of a first time or second time guilty plea that a judge can lower these fines. And so this punishment is really on the front end. What was the circumstances of Ms. Blake's fine? Because the district court referenced that there was a 500. Did that fine stand? Did she pursue any remedies with respect to it? So that fine, I believe part of it was vacated because the police officer submitted something after the fact saying that he didn't mean to give her three different tickets. Although I haven't looked at the record as of recently, that fine was still in place. And, you know, she was also excluded from the parks and she challenged that park exclusion and it was vacated halfway through. But for 14 days, she couldn't so much as go into any of the public parks and grants passed. Now, your opposing counsel indicated that Ms. Blake has passed away. Is that true? That is correct. Did that occur after the notice of appeal was filed? Yes. And we filed something with the court to notify the court about that.  Yes. If I have a question, if I may. Of course, Your Honor. Is there any relevance? Is there any relevance to the fact that some of the organizations that do provide shelter require the person taking advantage of the shelter to sign up to a particular religious ideology? Well, so this court analyzed that in Martin because at least one of the three shelters in Martin required that people go to a certain kind of church or a certain kind of chapel. And to be honest, I can't remember whether this court counted those beds as part of the math. I think it maybe did not. But here, the problem with the Gospel Rescue Mission is not that particular rule, although some individuals might find it offensive and troubling. The four pages of rules that I would direct the court to there, I think they can be found at Supplemental Excerptive Records 63 to 66, really prohibit a whole host of people. But the most important thing about the rescue mission is that you can't just show up there and get a bed because it's not an emergency shelter at all. It's a 30-day program that you have to be admitted to. And then once your 30 days are over, you're done with that program. And so it's really not an emergency shelter at all. I noticed I have five minutes and I would just like to take up what I think is one of the central issues in the city's briefing, which is that there's no evidence that they enforced these laws after Martin. That is just incorrect. What there's no evidence of in the record is that they changed their enforcement policy. And I would just like to quickly tick off where in the record we have examples of how the ordinances were enforced exactly the way they were before Martin, after Martin. I would start with Excerptive Record 301 to 317. Those 17 anti-camping and anti-sleeping tickets are given at all times of the day or night. There's no evidence that anyone is doing anything other than sleeping while staying warm. And they're given to people without addresses or their address is General Delivery Grants Pass. So we know these are class members who have nowhere else to go. Also at Excerptive Record 199 to 204, you have Deborah Blake's tickets, which you've already referenced. I would direct the court to Excerptive Record 354. That's the trespass order that she received. This is September of 2019, a year after Martin and 11 months after we filed this lawsuit. Her trespass order says if you were found to be on city property prior to the expiration of this exclusion ordinance, you will be arrested. The same language is that supplemental of Excerptive Record 163 for class member Colleen Bannon. But what's more, we know that Deborah Blake and class member Dolores Nevin got a new kind of ticket in late 2019 after Discovery had closed in this case. On the very last day for which we got Discovery, New Year's Eve day 2019, Dolores Nevin got a ticket for criminal trespass on city property, also $295. She was also excluded from all the parts. We don't know how many of these tickets were given. We do know the city agreed that they were using this new ordinance and they agreed to put it in District Court's limited injunction because without it, even that limited injunction would have no effect because the city would essentially be able to do the same thing with a different ordinance. The only proof and I would encourage the court to drill down, even though the city says repeatedly, maybe dozens of times, uses the phrase post-Martin enforcement. The only proof that they made any change to this is a single paragraph of a single police officer, Jason McGinnis. This is not the ordinance changes. I should have started with the ordinance changes and said those ordinance changes are, if anything, make matters worse. One of them has nothing to do with this case at all. It has to do with how long they hold personal property during a camp sweep, which is an ordinance we're not challenging. But the second one, which Mr. Heisel referenced, is they took the word sleeping out of the only the anti-camping in the city, but they replaced it with an even broader definition in what I call the principal anti-camping ordinance. So that now everywhere in the city, the definition of what it means to camp or what a campsite is, is that sweepingly broad definition. But getting back to the unwritten, because so I think we can dispose of the written changes, but the unwritten changes are harder to dispose of because they're unwritten. And this quote by Officer McGinnis is the following. It is the regular practice of every officer I know on this department to enforce these ordinances sparingly and in recognition of the different circumstances we encounter. I'm not sure what exactly Officer McGinnis is saying, but I feel like he's saying that we only do this at certain times after warnings. But if you look at the chief of police's email, which is a supplemental excerpt of record 135, the chief of police, this is eight months after we filed this lawsuit, nine months after Martin, he's responding to a citizen complaint about a homeless person being out in the woods. And he writes to his top brass and other elected officials. And he says to this, what he said to this person was, I also told him I would ask the site and move them along accordingly. And what's not in the record? Any of the people who got that email telling him, oh, chief, we have a new post-Martin enforcement. You can't do that anymore. And the reason that's not in the record is the chief of police is exactly correct. There was no change to the enforcement policy in Grants Pass after Martin. That's a litigation position that wasn't really even drilled into. It certainly wasn't mentioned at class certification. It was lightly touched on at summary judgment and really has become the centerpiece of their argument in front of this court. So if the court has no further questions, I'm exactly out of time and I would just end by saying that it's our position that this court should affirm the district court in this Put it to you and to Mr. Hissell jointly and I'll wait till his arguments conclude. Thank you, your honor. Glad I reserved some time now. I'll try to be as efficient as possible. There were several things there I think we need to respond to. One is I'm really concerned with the manner in which Mr. Johnson's argument came out. That there is intentional or otherwise this massive blurring of the legal issues. We're talking about camping. He went on this diatribe about how, oh, and then there's this other policy that we didn't even challenge and there's people still getting citations as if all citations against any class member for anything is there's some baked in assumption that it's an unconstitutional enforcement action and it's not. The very clear, uncontroverted position of the city is and has always been since Martin to make a distinction between sleeping and camping and to not cite anyone for sleeping. That is what I'm referring to when I say there is absolutely nothing in this record that supports that, which is what was being addressed in Martin. This case is distinguishable. We are not talking about sleeping. We're not talking. There is no evidence of that. We're talking about camping, separate and distinct. And as to all of these, that it's superior to address this as a class and there's no individual scrutiny needed at all, et cetera, et cetera. The Supreme Court dealt with this exact type of challenge in a trilogy of cases in 2010. That was Citizens United, United States v. Stevens. All these are cited in our brief and John Doe v. Reed. They were trying to figure out what the standard was when you have these mixed as applied versus facial challenges. And what they determined through those three cases was that like Robinson, a purely as no harm, no foul. But if you're asking that the ordinances that are facially valid be invalidated as to you or as applied to your class, like in this case, you still must meet the facial standard. It must still, there must still be no way for that law to be enforced legally in order to force the change. And that's exactly what they're asking to do. They keep calling it as applied and that's fine. The label's fine, but the standard is still facial. And Judge Collins asked him about the thousand person shelter just outside the city limits and how is the court to deal with that. And I do want to address there's this constant argument where we have offered not shelter, but other places for people to more indefinitely camp on public land by law, allowed by law without any risk of enforcement, just outside the city's limits. And every time the plaintiffs come back with, and the court and the district court are real critical of the city as if that's the policy is to like push them outside of the city limits. And that's not the case at all. The class that was certified included those living outside of the city limits. Of course, we need to address what options those people have. Two, they agree with us on a very critical point that even after Martin, the only way that it's not the only way to satisfy the eighth amendment is to provide a shelter option. I'm reading from, I'm going to quote a couple of pieces. This is from the transcript of oral argument at cross motions for summary judgment. At page eight of that transcript, Mr. Johnson argued to the district court that there was a menu of options, quote unquote, that is available to the cities and is laid out by the ninth circuit in footnote eight. He then goes on to say that the city could have set non-enforcement zones or non-enforcement hours and that, and praises Boise for doing those things. And that the city didn't do that. Their position throughout, and I could give you quote after quote from their brief pages, 43 pages, 48 and 49 are that the statutes themselves are unlawful because they do not have a carved out exception for these plaintiffs only. That is why that position that they're taking is why they did not even try to meet their burdens in this case. They didn't try to meet the burden on as to a facial challenge. They readily admit they could not sustain one. They didn't try to present evidence of a persistent pattern of unlawful enforcement practices because they didn't think they needed to. On that other inquiry, they just relied on this nebulous math from Martin. And he hinted at some of those issues in his argument where he says, you know, and it's an undercount and we can't really even know what it is. And I think it's critical that Judge Gould asked about the religious aspect of the gospel rescue mission in town. While it is true that if this were the Boise case and the Hobson's choice being presented to these individuals was take the GRM or go to jail, very problematic. But that is not the case here. Instead, the GRM becomes critically relevant to this individual scrutiny question because that is a great place that has served people that would be otherwise unsheltered for decades in that community, has over a hundred bed capacity and has been serving that community for decades. And everyone in that place by definition is still HUD homeless. They're still part of the class. And so even though they have shelter, according to the nebulous math from Martin, if you don't count it, and the judge in this case had excuses why nothing counted as anything in similar ways, the youth didn't, only held youth. So it doesn't count as anything. If you go to that math, then even all of those people, the city would still have to have a 600 plus HUD certified emergency shelter within its city limits that allowed Ms. Gloria Johnson's dog and allowed for, you know, had no rules and et cetera, et cetera, in order to satisfy the way that the district court and the plaintiffs have interpreted Martin and applied it to this case. I see that I'm over time. So if I don't have any questions, I will conclude. Judge Collins, I have no questions. Can I have one more minute, your honors? Certainly go ahead. The, I just want to make a quick note on the entirety of our focus on this oral argument thus far has been on the eighth amendment claim, there is, there is also a 14th amendment claim and that issue is a little more rigid and straightforward in my mind, one thing I wanted to point out on that one is it was not pled. And even now on the briefing, they're not claiming that it was pled. They're claiming that you guys should apply the standard of FRCP 15 as if they had filed an amended complaint or asked to amend the complaint to add it into the pleadings. We are saying we don't, and the judge, the district court was critical of us for not asking for it to be explained. We put the burden on us to ask the defendant or the plaintiff to amend their pleading so that we would have sufficient notice. The first time that that 14th amendment claim that is still here was at all anywhere in this was at summary judgment. And all the court needs to do is look at the operative amended complaint to see that it was not pled. It is like the operative amended complaint is framed in fairly broad terms because it references the anti camping ordinances says they don't provide sufficient notice and said plaintiffs have not been giving meaningful notice prior to being deprived of the Liberty interests and moving freely through grants, pass resting, sleeping, and see sleeping shelter from the elements that sort of leads to be worked out in litigation, the precise, you know, problems and where the lack of notice is. So I'm not sure this is a pleading defect. I disagree, your honor, because if, if that's the case, if that's the standard, then you certainly invite some pleading games if, if what they're saying is true and that's what they were pleading. They had a specific statute in mind that was not a notice issue at all. It was an appeal issue. It was that the appeal statute, the appeal ordinance and the appeal process themselves were defective. That was the challenge that showed up. But it's a specific aspect. It's the fact that they get excluded from the park during the appeal. That really seems to be the, correct. But why isn't that embraced within the language that they don't have meaningful notice to due process before they're, you know, subject to such an exclusion because the, there's no facts to support it in the complaint. There's no facts to support it in the complaint either. I mean, if that was the theory you would expect to find and people are excluded while their appeal process plays out, anything to that effect, the word appeal doesn't even, the ordinance that ultimately gets challenged is only the appeal and the word appeal and that ordinance, neither of those two are anywhere in the complaint. So if, if the standard is going to be, well, you can be as vague as possible. And then it's on the defendants to figure out what mysteries you've you would invite a lot of pleading games. If that becomes the new standard. I would say that at a, at an absolute minimum, both eight and every case interpreting eight would require the basic modicum of facts to put the defendant on reasonable notice. And if their theory could have easily been in the complaint and was not. Hey, thank you, Mr. Hassell. May I just have 30 seconds to respond to that last point since it was a new on rebuttal? Go ahead. Yes. It is our position that we pled that claim. It was the sole reason for our last amended complaint. And you can see the references as judge Collins pointed out at paragraphs 24, 54 and 87 and paragraphs three and four of our prayer at that final complaint, which is an excerpt of record 412 to 430. So it's our position that that claim was fully pled. And certainly there was voluminous information that was elicited during discovery about how that, how that park exclusion worked and how you appealed it. And so the city was not in any way prejudiced by the district court, not requiring us to yet again, amend the complaint to add more specifics to that claim. Thank you. I'd love to listen to both of you argue all day, but we're going to have to bring this to a close. Let me now ask my question of the two of you. This is solely a judge Gould question because the panel hasn't conferred. I don't know if you're interested or other members of the panel are, but I would like to know whether the two of you have mediated under the ninth circuits, auspices or through the district court. If there's any prospect that the, that the two of you bring a lot of knowledge and expertise to this area, could profitably narrow the issues or seek through mediation to reach a resolution of at least some issues. I know often parties have options that the court doesn't have in particular cases because of the record or the way issues are framed. But I suspect Mr. Esau has the era of the city of Grants Pass. Mr. Johnson has the era of the class. So I just pose that question. You don't have to decide anything today, but if there's any possibility of that, that you embrace that the panel could send an order to the parties to let you explore. I think for the court's inquiry and along those lines, I think it's important to know that Mr. Johnson and I have maintained a very good working professional relationship throughout this, and there have been quite a few times where we have picked up the phone and been able to sort things out between us, most notably, probably paragraph four of the injunction that's in place that Mr. Johnson, you know, touted as reasonable. We both wanted to be in a place that we could get through this appeal process, this lengthy appeal process without having to come back and look into stay things and complicate the appeal process. And we were able to do that. And I'm certainly willing to talk to Mr. Johnson some more and the city. But I think that we have done as much negotiating as we possibly could on these pretty important issues. And the plaintiff's position is that we're happy to sit down with a mediator. We did go through the Ninth Circuit mediation program and it was kind of a truncated process. I don't think we ever really engaged with that, but from the plaintiff's perspective, we're happy to do that. Okay. Well, I'll just keep you in the dark for now. So as I said, the panel hasn't conferred on this case, but if we think mediation might be explored profitably, we'll send an order to that effect. In either event, the parties will hear from the panel in due course. I again want to thank Mr. Johnson for your professional advocacy. For those of us who used to be advocates long ago, you make us sort of homesick for advocacy. Both did a very nice job. So without further ado, I think at this point, the Gloria Johnson, the City of Grants past case shall be submitted and the parties will hear from the panel in due course. Thank you.
judges: GOULD, COLLINS, Silver